## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| TIMOTHY FREDRICKSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 3:25-cv-0820-X (BT) |
| | § | |
| WILLIAM K. MARSHALL III, | § | JURY TRIAL DEMANDED |
| BRYAN WEAVER, GREGORY | § | |
| SCHANFISH, FNU WALLACE, FNU | § | |
| RUSSLE, REGIONAL DIRECTOR | § | |
| FNU LNU, REGIONAL | § | |
| PSYCHOLOGIST FNU LNU, | § | |
| KATHY ZOOK, FNU RIVERS, | § | |
| SCARLET GRANT, FNU KING, | § | |
| AND FNU ALAUSA, | § | |
| | § | |
| Defendants. | § | |

## AMENDED COMPLAINT

Plaintiff Timothy Fredrickson ("Plaintiff" or "Mr. Fredrickson") filed his original Complaint on April 4, 2025, and, with the Court's leave, files this Amended Complaint against Defendants Director William K. Marshall III, Nurse Bryan Weaver, Chaplain Gregory Schanfish, Doctor FNU Wallace, FNU Russle, South Central Regional Director FNU LNU, South Central Regional Psychologist FNU LNU, Warden Kathy Zook, Warden FNU Rivers, Warden Scarlet Grant, Administrator FNU King, and Nurse FNU Alausa (collectively, "Defendants").[1] Mr. Fredrickson respectfully will show the following:

## INTRODUCTION

1.    Mr. Fredrickson is a Christian male who has been in the custody and care of the United States Bureau of Prisons ("BOP") since 2020 and is currently incarcerated at the Federal

---

[1]    Mr. Fredrickson respectfully asks the Court to amend the style of this case to align with the Defendants as set forth herein.

Correctional Institution in Seagoville, Texas ("FCI-Seagoville").

2.    Mr. Fredrickson was raised as a Christian with strong beliefs in the teachings of the Bible.  In his incarceration, Mr. Fredrickson continues to practice his Christian faith through regular attendance in chapel services, prayer, and Bible study.

3.    A central tenet of Mr. Fredrickson's Christian faith is the teaching that the body is a temple of God, and as a temple, must be protected from unholy acts.  To exercise this sincerely held religious belief, Mr. Fredrickson does not inject his body with any unnatural substance, including vaccinations and tattoos.

4.    Under the infectious disease management policies promulgated by the BOP, all federal inmates must be routinely screened for tuberculosis.

5.    There are three clinical methods to test for tuberculosis infection: Tuberculin Skin Test, Interferon-Gamma Release Assay (a blood test), or x-ray of the chest and lungs.

6.    A Tuberculin Skin Test ("TST") is administered by injecting a purified protein derivative ("PPD") of the tuberculin bacteria under the skin of the forearm.  The injection site is evaluated for reactivity by a medical professional after 48-72 hours.

7.    Tuberculosis screening through a TST is contrary to Mr. Fredrickson's sincerely held religious belief that the body is a temple of God and must be protected from unholy acts because a TST requires a PPD injection.

8.    Defendants are BOP individuals who, during Mr. Fredrickson's incarceration and at all times relevant to the claims herein, have held authority and responsibility for his medical treatment, care, and safety.

9.    Defendants held knowledge at all relevant times that the PPD injection in a TST violates Mr. Fredrickson's sincerely held religious beliefs.

2

10.     Defendants knew that Mr. Fredrickson vigorously objected to PPD injections as a violation of his religious beliefs yet refused to accommodate his reasonable request to be tested for tuberculosis through an alternative method that does not require a PPD injection.

11.     The BOP infectious disease management guidelines prohibit religious accommodations for tuberculosis testing, and instead require BOP medical staff to perform TST with PPD injections.  The BOP policies demand BOP staff inject unwilling or objecting inmates by physical force.

12.     Because of this unconstitutional policy that bars any tuberculosis screening method accommodation for an inmate's religious beliefs, Defendants refused to accommodate Mr. Fredrickson's request to be tested for tuberculosis by a blood test or chest x-ray.

13.     Instead, Defendants demanded Mr. Fredrickson submit to a TST with a PPD injection.  Defendants threatened him with punishment, including placement in the Special Housing Unit, colloquially known as solitary confinement, until he acquiesced to their demand for him to abandon his religious beliefs and submit to a PPD injection.

14.     In the face of an impossible choice to violate his religious beliefs or receive severe punishment, Mr. Fredrickson was injected against his will with a PPD.  While incarcerated at FCI-Seagoville, Mr. Fredrickson has been threatened and coerced into receiving a PPD injection three times: in 2021, 2022, and 2024.  After each forced injection, Mr. Fredrickson suffers extreme distress at being compelled to violate a tenet of his faith.

15.     At Defendants' hands, Mr. Fredrickson was subjected to these violations of his sincerely held belief against injections of unnatural substances.

16.     Even though in 2025 Defendants granted Mr. Fredrickson an accommodation at FCI-Seagoville, he continues to be subjected to forced PPD injections through the application of

the BOP's unconstitutional policies that require TST testing for inmates who are transferred to a different BOP correctional institution.

17.    Moreover, BOP medical staff's inconsistent medical practices and record-keeping expose Mr. Fredrickson to continued imminent harm of additional forced PPD injections by BOP staff who refuse to acknowledge his accommodation.

18.    Mr. Fredrickson has fully and to the extent otherwise possible exhausted his available administrative remedies.

19.    Mr. Fredrickson now brings this action to seek just compensation for his injuries and to bring Defendants to account for their failure to accommodate his sincerely held religious beliefs.

20.    To vindicate his rights, Mr. Fredrickson seeks declaratory, injunctive, and monetary relief under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(c) ("RFRA"); the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; and the First Amendment to the U.S. Constitution.  He seeks, *inter alia*, (i) declaratory and injunctive relief against the government officials responsible for creating and promulgating the BOP infectious disease management and tuberculosis testing protocols that prohibit any form of religious accommodation for sincerely held religious beliefs; (ii) declaratory and injunctive relief against the individuals who enforced the BOP tuberculosis testing protocols to deny his request for religious accommodation; and (iii) monetary relief for damages suffered as a result of the denial of his request for religious accommodation and subsequent forced PPD injections that violate his religious beliefs.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has the authority to grant declaratory relief pursuant to RFRA, 42 U.S.C. § 2000bb-

1(c); the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; and the First Amendment to the U.S. Constitution.  Monetary damages are available pursuant to RFRA, 42 U.S.C. § 2000bb-1(c).

22.    This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(2) because Defendants are officers and employees of the United States or its agencies operating under color of law, and the majority of the events or omissions giving rise to Mr. Fredrickson's claims have occurred and are occurring in the Northern District of Texas.

## THE PARTIES

23.    Plaintiff Timothy Fredrickson is a citizen of the United States and a permanent resident of Illinois.  He is an incarcerated person currently in the custody of the BOP, and has been incarcerated at FCI-Seagoville since 2021.  Mr. Fredrickson is a Christian who believes that the foundational tenets of his faith require him to respect his body as a temple for God.

24.    Defendant William K. Marshall III is the Director of the Federal Bureau of Prisons.  Defendant Marshall is responsible for the overall management and operation of all BOP facilities, ensuring the care, treatment, and security of all federal inmates in BOP custody.  The BOP promulgates regulations, procedures, and guidelines for the administration of medical care, including the Infectious Disease Management (Policy 6190.04) and Clinical Guidance on Tuberculosis (updated February 2020).  The Director of the BOP approves all BOP regulations, procedures, and guidelines.  Defendant Marshall is sued in his official capacity.

25.    Defendant Bryan Weaver was a nurse in the FCI-Seagoville medical facility ("Seagoville Medical") during the events giving rise to Mr. Fredrickson's claims.  As a BOP nurse, Defendant Weaver was responsible with administering tuberculosis testing at FCI-Seagoville.  Defendant Weaver denied Mr. Fredrickson's requests for religious accommodation through alternative tuberculosis testing, threatened him with physical punishment and placement

5

in the Special Housing Unit ("SHU"), and forced Mr. Fredrickson to be injected with PPD.  On information and belief, Defendant Weaver is currently employed by the United States Bureau of Prisons.  Defendant Weaver is sued in his individual and official capacity.

26.    Defendant Gregory Schanfish is a chaplain with the BOP, and was a chaplain at FCI-Seagoville during the events giving rise to Mr. Fredrickson's claims.  As a BOP chaplain at FCI-Seagoville, Defendant Schanfish is responsible for addressing the religious needs of inmates, including processing an inmate's formal request for religious accommodations.  Defendant Schanfish is also responsible for processing an inmate's New and Unfamiliar Religious Questionnaire.  Defendant Schanfish is being sued in his individual and official capacity.

27.    Defendant FNU Wallace is a doctor at FCI-Seagoville.  As a BOP medical care provider, Defendant Wallace is responsible for the medical care of inmates in the care and custody of the BOP, including administration of tuberculosis testing at FCI-Seagoville.  Defendant Wallace denied Mr. Fredrickson's requests for religious accommodation through alternative tuberculosis testing, threatened him with placement in the SHU for an undetermined length of time, and forced Mr. Fredrickson to be injected with PPD.  Defendant Wallace is being sued in his individual and official capacity.

28.    Defendant FNU LNU is the South Central Regional Director of the BOP.  The Regional Director is responsible for the overall administration of the correctional and program activities within the South Central Region.  The Regional Director is responsible for supervision of wardens and other prison staff.  The Regional Director is additionally charged with accepting and overseeing resolutions to inmate grievance appeals and other requests that require regional-level administrative approvals.  The Regional Director is sued in his or her individual and official

capacity.

29.     Defendant FNU Russle[2] is the South Central Regional Medical Director for the BOP.  The South Central Region includes FCI-Seagoville.  Defendant Russle held that position during the events giving rise to Mr. Fredrickson's claims.  The Regional Medical Director is responsible for coordinating the medical care of inmates in the custody and care of the United States Bureau of Prisons, including infectious disease testing and treatment.  The Regional Medical Director has the authority to review and grant inmate requests for religious accommodation in medical care.  Defendant Russle is sued in his individual and official capacity.

30.     Defendant FNU LNU is the Regional Psychologist[3] of the BOP for the South Central Region.  The Regional Psychologist is responsible for overall administration of the mental health care and treatment of the population in BOP custody.  The Regional Psychologist works with other BOP Regional Administrators to resolve inmate requests related to their medical care and treatment, and has the authority to grant or deny such accommodations.  The Regional Psychologist is sued in his or her individual and official capacity.

31.     Defendant Kathy Zook was the Warden of FCI-Seagoville during some or all the events giving rise to Mr. Fredrickson's claims.  The FCI-Seagoville Warden is the chief executive of FCI-Seagoville and is responsible for its overall management and correctional operations.  The Warden is responsible for reviewing and accepting inmate requests, grievances, and grievance appeals.  Defendant Zook is sued in her individual and official capacity.

32.     Defendant FNU Rivers[4] was the Warden of FCI-Seagoville during some or all the events giving rise to Mr. Fredrickson's claims.  The FCI-Seagoville Warden is the chief

---

[2] Possible alternative spellings could include "Russel."
[3] Possible job titles include "Advanced Care Level Psychologist," "Chief Psychologist," and "Specialty Program Director."
[4] Possible first name beginning with the letter "C."

executive of FCI-Seagoville and is responsible for its overall management and correctional operations. The Warden is responsible for reviewing and accepting inmate requests, grievances, and grievance appeals. Defendant Rivers is sued in his or her individual and official capacity.

33. Defendant Scarlet Grant was the Warden of FCI-Seagoville during some or all the events giving rise to Mr. Fredrickson's claims. The FCI-Seagoville Warden is the chief executive of FCI-Seagoville and is responsible for its overall management and correctional operations. The Warden is responsible for reviewing and accepting inmate requests, grievances, and grievance appeals. Defendant Grant is sued in her individual and official capacity.

34. Defendant FNU King[5] is the Assistant Administrator at FCI-Seagoville and an employee of the BOP. At all times relevant to the events giving rise to Mr. Fredrickson's claims, Defendant King served as the administrator for operations and programs at FCI Seagoville. The Assistant Administrator is responsible for overseeing the Inmate Administrative Remedy program and grants or denies inmate requests made through the program. The Assistant Administrator has the authority to grant or deny an inmate's request for religious accommodation. Administrator King is sued in his individual and official capacity.

35. Defendant FNU Alausa[6] is a nurse at FCI-Seagoville. As a BOP medical care provider, Defendant Alausa is responsible for the medical care of inmates in the care and custody of the BOP, including administration of tuberculosis testing at FCI-Seagoville. Defendant Alausa denied Mr. Fredrickson's requests for religious accommodation through alternative tuberculosis testing and forced Mr. Fredrickson to be injected with PPD. She is sued in her individual and official capacity.

---

[5] Possible first name beginning with the letter "J."
[6] Possible first name beginning with the letter "I."

## FACTUAL BACKGROUND

**Tuberculosis Testing Methods and BOP Policies and Procedures**

36.    Tuberculosis is transmitted through airborne respiratory droplets when an individual with active pulmonary tuberculosis coughs, sneezes, speaks, or sings.  Tuberculosis infections can be active or latent, and recommended treatment includes isolation to prevent the spread to non-infected persons.   Transmission depends on many factors, including the environment and airflow in which the exposure occurred.

37.    There are three methods for testing for tuberculosis infection: Tuberculin Skin Test, Interferon-Gamma Release Assay ("IRGA"), and x-ray of the chest and lungs.

38.    In the TST, a small amount of PPD, derived from the tuberculin bacteria, is injected under the skin of the forearm.  PPD creates a hypersensitivity reaction if the person has been infected with tuberculosis bacteria.  The skin test is not indicative of tuberculosis infection until 48–72 hours after a PPD injection.  Then, the PPD injection site reaction can be read by a medical professional.  Before the expiration of 48–72 hours, the TST is not indicative of whether a tested person is infected with tuberculosis.

39.    IRGA tests for tuberculosis by testing a patient's blood sample.  The blood sample must be processed within 8 to 32 hours after collection, and once tested, results can be available within 24 hours.  The Centers for Disease Control and Prevention ("CDC") recommend IRGA as the preferred method of testing in most cases.  *See* Exhibit A (CDC Clinical Testing Guide for Tuberculosis).

40.    Finally, a chest x-ray is the third method to test for tuberculosis.  In a person infected with tuberculosis, the chest x-ray will appear abnormal, but a chest x-ray alone cannot lead to a positive tuberculosis diagnosis.

41.     As part of the BOP's management of infectious diseases, federal inmates are systematically screened for tuberculosis.  The BOP promulgates requirements for the testing and treatment of federal inmates through its Clinical Guidance for Tuberculosis, published in 2015 and updated in February 2020, as well as the BOP Infectious Disease Management, Policy No. 6190.04 (collectively, the "BOP Infectious Disease Policies").  *See generally* Exhibit B (BOP Tuberculosis Management); Exhibit C (BOP Infectious Disease Management).

42.     The BOP Infectious Disease Policies include treatment directions, which include, among other curative measures, airborne infection isolation, in which inmates who are suspected of having tuberculosis must be promptly isolated in an inborne infection isolation room, where the inmate must remain until they meet the criteria for discontinuation of medical isolation.

43.     At intake into a BOP facility, all federal inmates are screened for tuberculosis. The BOP Infectious Disease Policies require TST or IRGA testing to screen for latent tuberculosis infections, and instruct that a baseline TST should be obtained on all new inmate intakes to the BOP facilities, regardless of prior testing results from other detention facilities.

44.     While the BOP Infectious Disease Policies provide an exception for inmates who have a documented prior positive TST while incarcerated within the BOP, on information and belief, an inmate's prior medical records are not available to BOP medical staff at in-take.  Thus, an inmate who is exempted from a TST may still be forced to receive the PPD injection.

45.     After the baseline TST test at intake, federal inmates are tested annually for tuberculosis.  The BOP Infectious Disease Policies do not include isolation or any quarantine precautions for inmates during the 48–72 hours in which the TST is not reactive.  While the BOP Infectious Disease Policies provide protocols for IRGA testing, the BOP does not recommend

IRGA for routine testing.  Exhibit B at 9 (BOP Tuberculosis Management).  IRGA may be used, however, with prior approval of the Regional Medical Director.  *Id.* at 12.

46.    If an inmate refuses tuberculosis screening by a TST, the BOP Infectious Disease Policies command institutional medical staff to test the inmate involuntarily, and include reference to the BOP's use of force and restraints policies.  Exhibit C at 3, 10 (BOP Infectious Disease Management).  If an inmate is tested by force, the BOP facility Clinical Director must inform the BOP national and regional leadership of the inmate's name, diagnosis, a description of the incident, and some description of counseling and education provided to the inmate.  *Id.* On information and belief, BOP policies allow correctional and medical staff to place an inmate in the SHU for refusing to follow a directive, including submitting to medical treatment.

47.    Placement in the SHU is solitary confinement, but only serves as punishment through physical and social isolation, not medical or respiratory isolation.  On information and belief, the SHU cells at FCI-Seagoville are part of the general HVAC system, and inmates kept in the SHU share common breathing space with the general prison population.

48.    After the PPD test is administered, an inmate returns to the general prison population, and is not placed in respiratory isolation or any form of quarantine while the test matures to be read.  Even when an inmate tests positive for tuberculosis, whether or not he refuses treatment through medication, the inmate is returned to the general prison population.  Thus, even if an inmate were to receive tuberculosis testing by a PPD injection, test positive for latent tuberculosis, and refuse to take medication, BOP officials would place the inmate with the general prison population, rather than in any form of isolation.  Thus, a PPD injection as an exclusive testing method does not and cannot further the BOP's legitimate compelling interest in screening and protecting inmates and BOP staff from tuberculosis.

49.     The BOP Infectious Disease Policies also requires routine blood tests to screen the federal inmate population for human immunodeficient virus ("HIV").  *See* Exhibit C at 5 (BOP Infectious Disease Management).  To give effect to this policy requirement, BOP medical facilities are equipped to collect and test blood samples for pathogens.

**Mr. Fredrickson's Sincerely Held Christian Belief Against Injections**

50.     Mr. Fredrickson was raised as a Christian by his family in Illinois and made a personal commitment to the Christian faith when he was in kindergarten.  While attending church, his religious leaders instructed that the Christian faith included respect for the body as a temple of God.  Mr. Fredrickson's personal study of the Bible reaffirmed his belief of this particular religious tenet.  He therefore believes that his religion requires him to organize his life according to the Bible and its command to respect his body as a temple.

51.     Mr. Fredrickson believes that an important requirement of this tenet, consistent with his understanding of the teaching of the Bible, is the prohibition of unnatural medical interventions.  Mr. Fredrickson believes that this includes the prohibition of injections of unnatural substances, even if the injection is for medical purposes or is forced upon him.  Mr. Fredrickson believes that PPD injections by BOP correctional officers and medical staff violate the precepts of his faith.  Mr. Fredrickson does not object, and has never objected, to tuberculosis screening by other testing methods that do not violate his religious beliefs.  Moreover, he does not refuse medical testing or treatment that does not require an unnatural substance be injected into his body, such as COVID-19 testing by nasal swab.

52.     While in BOP custody, Mr. Fredrickson practices his religion by attending chapel services, praying, reading the Bible, and preserving his body as a temple for God.  He has no

tattoos, avoids taking unnatural medications, and declines vaccinations such as COVID-19 and flu vaccine in 2021.  Exhibit D (Record of vaccinee refusals).

**Threats and Coercion Force a PPD Injection**

53.    When Mr. Fredrickson first entered BOP custody and care at MCC Chicago in 2020, he was processed through medical intake screening.  As promulgated in the BOP Infectious Disease Policies, he was asked to receive tuberculosis testing by a PPD injection.  He declined the PPD injection and stated that his religious belief prohibited him from receiving any form of injection.  When he continued to refuse the PPD injection, BOP corrections officers handcuffed Mr. Fredrickson, strip searched him, and placed him naked in the SHU.  Later that day, a BOP officer came to Mr. Fredrickson's SHU cell and asked if he was ready to receive the PPD injection now.  Mr. Fredrickson continued to refuse, and the officer left.

54.    The following day, after spending the night in the SHU, a BOP nurse came to Mr. Fredrickson's cell and asked if he would now accept the PPD injection.  Mr. Fredrickson again declined, stating that his religion prevented it and asked to be tested by an alternate method, such as by chest x-ray.  The nurse did not accept his request and continued to coerce him by bringing another correctional officer to Mr. Fredrickson's SHU cell.  That correctional officer brought a folded page of an unidentified BOP policy and presented Mr. Fredrickson with the folded page, showing where policy authorized correctional officers to use force to administer PPD injections. The correctional officer threatened that if Mr. Fredrickson did not willingly accept the PPD injection, the officer would "come in with a squad of officers in full riot gear to hold you down and stick it in the back of your [expletive] neck."

55.    Mr. Fredrickson was faced with the impossible choice of physical assault and forceful injection in adherence to his religious beliefs or accepting an injection against his

13

religious belief.  In the face of this choice, Mr. Fredrickson elected to receive the PPD injection.  Exhibit E (History of PPD injections).  He covered his face at the time of injection to avoid seeing his body violated against his religious belief.

56.     After receiving the PPD injection, Mr. Fredrickson experienced severe psychological distress from the forced violation of his religious beliefs.  He felt that he had been compelled to renounce his faith and belief that his body is a temple for God.  He continues to suffer psychological harm from the violation of his bodily autonomy and religious beliefs.

**The First and Second Forced Injections at FCI-Seagoville**

57.     On or around February 24, 2021, Mr. Fredrickson was transferred from MCC-Chicago to FCI-Seagoville.  As part of his medical intake screening at FCI-Seagoville, Defendant Wallace and a female nurse prepared to test Mr. Fredrickson for tuberculosis by a TST with a PPD injection.[7]  Mr. Fredrickson objected to the PPD injection as against his sincerely held religious belief, and asked to be tested by IRGA or chest x-ray as an accommodation.

58.     Defendant Wallace rejected his religious accommodation request and attempted to coerce Mr. Fredrickson to violate his religious beliefs by threatening him, stating that Mr. Fredrickson must "take the injection now or go to the SHU.  There will be no discussion about anything."

59.     Mr. Fredrickson was presented with the choice to either allow Defendant Wallace to inject him with a foreign substance, violating his sincerely held religious beliefs as a Christian, or refusing and being sent to the SHU indefinitely, or being otherwise disciplined, until he decided to violate his religious beliefs.

---

[7] The female nurse is not named as a defendant in this lawsuit.

60.     The choice presented by Defendant Wallace to either submit to the test or adhere to Mr. Fredrickson's beliefs and endure an indefinite seclusion and punishment in the SHU constitutes a substantial burden on the exercise of his religious belief.

61.     Indeed, Mr. Fredrickson is familiar with the punishment of long confinement in the SHU.  While at MCC Chicago, Mr. Fredrickson was placed in the SHU for more than 28 days for an unrelated incident.  During that time, he could not use the library, take communal meals, or engage in congregate worship.  Thus, Defendant Wallace's threat of indefinite placement in the SHU presented Mr. Fredrickson with an impossible decision.  Defendant Wallace's threat put substantial pressure on Mr. Fredrickson to modify his behavior by allowing the PPD injection and thus violate his beliefs.

62.     Under the threat of placement in the SHU and physical coercion, Mr. Fredrickson was injected with PPD in his left forearm against his will.  Exhibit E (History of PPD injections).  At the time of the injection, he covered his face to shield his eyes from seeing his body violated against his religious belief.

63.     The coerced violation of his religious beliefs through a forced PPD injection caused Mr. Fredrickson to experience the same extreme psychological and spiritual distress and grief that he experienced after the first forced PPD injection.

64.     The violation of his religious beliefs led Mr. Fredrickson to research BOP tuberculosis testing policy, where he encountered the BOP Infectious Disease Policies.  After reading the BOP Infectious Disease Policies' requirements for testing through either TST or IRGA, Mr. Fredrickson believed he could request to be tested through IRGA or by a chest x-ray at his next annual screening.

65.     That understanding was mistaken.   On January 6, 2022, Mr. Fredrickson presented to Seagoville Medical, and again, stated his request for tuberculosis testing in a manner that did not violate his religious beliefs.   Again, medical staff ignored his request, and he was forced with the impossible choice again to either adhere to his religious beliefs, again facing the threat of punishment for refusal, or be injected with PPD in violation of his religious beliefs.   Mr. Fredrickson again succumbed to the pressure to violate his beliefs, and was injected with PPD in his left forearm.   Exhibit E (History of PPD injections).   At the time of the injection, he covered his face to shield his eyes.

66.     After receiving the PPD injection, Mr. Fredrickson suffered the same psychological and spiritual grief as he had after the first two forced injections.   He continues to suffer the effects of the forced violation of his sincerely held religious beliefs and bodily autonomy.

**The First Request for Religious Accommodation Through Administrative Processes**

67.     Despite receiving multiple PPD injections against his will, Mr. Fredrickson remained steadfast in his belief and adherence that submitting to PPD injections violated the tenets of his religion.

68.     Mr. Fredrickson sought an accommodation for his religious practices through the BOP's internal administrative processes.   Believing that his request was religious in nature, he first sought accommodation through FCI-Seagoville's chaplain, Defendant Schanfish, rather than the traditional BOP Inmate Administrative Remedy program.

69.     Mr. Fredrickson sent Defendant Schanfish an electronic message on March 8, 2022 detailing his religious accommodation request to be tested for tuberculosis by IRGA or chest x-ray, rather than TST with a PPD injection.   Exhibit F (2022 Messages to Schanfish).   In

his message, Mr. Fredrickson stated that medical staff at FCI-Seagoville twice refused to accommodate his religious request for testing by alternate methods. He stated that even after he pointed out BOP policy, which recommends testing by alternative methods, he was threatened and coerced into receiving the PPD injection against his religious beliefs. *Id.* at 2.

70.    Rather than accept Mr. Fredrickson's request for his sincerely held religious belief, Defendant Schanfish subjected Mr. Fredrickson to improper and intrusive scrutiny. Defendant Schanfish responded by requiring Mr. Fredrickson to detail "how injections conflict with his religion" and to provide "authoritative religious documentation" that supports his religious belief.

71.    Even though Mr. Fredrickson is not required to provide proof of his religious beliefs, he responded on May 8, 2022 with a description of his Christian faith and Bible verses that support his belief that the body is a temple. Mr. Fredrickson invoked the RFRA and requested that the BOP allow testing inmates for tuberculosis through a less restrictive alternative like a chest x-ray or IGRA. *Id.* at 1.

72.    Defendant Schanfish then responded that he would "look into this and get back to [Mr. Fredrickson]." *Id.* at 1. He later asked Mr. Fredrickson to complete a "New and Unfamiliar Religious Questionnaire" form. In that form, Mr. Fredrickson detailed again that he held a religious belief that the body is a temple and that belief prohibited injections of any unnatural substance. He also provided Bible verses to support his faith. Once more, he cited the protections under RFRA and requested a religious accommodation for tuberculosis testing through an alternative method.

73.    Mr. Fredrickson never received an approval or denial of his request. At multiple times between May 24, 2022 and January 2023, when he attended regular chapel services, Mr.

17

Fredrickson asked Defendant Schanfish for an update on his request, but Defendant Schanfish declined to provide any information.  As time progressed and the time for his next annual tuberculosis screening came closer, Mr. Fredrickson became more insistent in asking Defendant Schanfish for an update.  Defendant Schanfish never provided an update, much less a denial or approval, or requested additional information.

74.    Because his request was religious in nature and made through Defendant Schanfish and the Seagoville Chapel, Mr. Fredrickson did not believe he could submit an administrative appeal through the BOP Inmate Administrative Remedy program.    Mr. Fredrickson believed those to be two separate administrative approval processes, and continued to seek relief through Defendant Schanfish.

**Defendant Weaver Attempts to Coerce Another PPD Injection Through Threats**

75.    Defendant Schanfish, however, did not process or approve Mr. Fredrickson's request for a religious accommodation, and on January 24, 2023, Mr. Fredrickson was called to Seagoville Medical for his annual tuberculosis screening.  There, members of the BOP medical staff attempted to administer tuberculosis screening through a TST with a PPD injection and attempted to inject him.  Mr. Fredrickson told them that he requested a religious accommodation based on his belief that prohibits unnatural injections, and asked to be tested through an alternate method of IRGA or a chest X-ray.  Mr. Fredrickson explained that the BOP Infectious Disease Policies include IRGA as an available testing option.

76.    The medical staff directed Mr. Fredrickson to Defendant Weaver's office. Defendant Weaver told Mr. Fredrickson that BOP protocol provided no alternative testing for a religious accommodation, and that he would only follow BOP testing protocol.  When Mr.

Fredrickson explained that IRGA testing is part of BOP Infectious Disease Policies and offered to bring a copy for Defendant Weaver, Defendant Weaver refused.

77.     Standing up over Mr. Fredrickson who was seated, Defendant Weaver resorted to threats in an attempt to coerce Mr. Fredrickson to modify his behavior by allowing the PPD injection and thus violate his religious beliefs.  In increasingly hostile and angry tones, Defendant Weaver told Mr. Fredrickson that if he did not accept the PPD injection, he would put Mr. Fredrickson in the SHU until the South Central Regional Director allowed Defendant Weaver to bring a five-man team to his cell to restrain Mr. Fredrickson and forcefully administer the injection.  He told Mr. Fredrickson that he had done exactly that many times before when inmates refused medical treatment.

78.     Moreover, Defendant Weaver impermissibly questioned the validity of Mr. Fredrickson's religious belief.  Defendant Weaver argued that Mr. Fredrickson's religious beliefs were invalid and a "sudden claim to religion," pointing to the medical records of two forced PPD injections in 2021 and 2022.

79.     Defendant Weaver continued to justify his threats and coercion by describing how he was forced to receive the COVID vaccine while serving in the military, despite his reluctance to do so.  Defendant Weaver represented that because he was still unhappy about forcibly receiving the COVID vaccine, Mr. Fredrickson must also receive a forced injection.

80.     Finally, Defendant Weaver threatened to retaliate against Mr. Fredrickson by telling him "we don't like squeaky wheels around here," and that FCI-Seagoville "gets rid of prisoners" who complain too much or file too much paperwork.  Defendant Weaver stated multiple times that "squeaky wheels" were not tolerated.  Mr. Fredrickson understood this threat as a means to deter him from seeking administration remedies through the BOP Inmate

Administrative Remedy program by filing a BP-9 (Request for Administrative Remedy), BP-10 (Regional Administrative Remedy Appeal), or BP-11 (Appeal to General Counsel) grievance form.

81.     When Mr. Fredrickson continued to refuse, Defendant Weaver allowed him to leave Seagoville Medical but return the following day for a TST with a PPD injection, and Mr. Fredrickson left.  Because of Defendant Weaver's threats to place him in the SHU and warning that FCI-Seagoville "got rid of" prisoners who complain, Mr. Fredrickson did not file a grievance.  He was afraid that Defendant Weaver would learn of the complaint and then act on his threats if Mr. Fredrickson filed a BP-9, BP-10, or BP-11 grievance form, which are processed by the Warden or BOP regional administration.

82.     Contrary to Defendant Weaver's stated treatment plan, he did not call Mr. Fredrickson to Seagoville Medical the following day.

83.     Instead, Mr. Fredrickson was called to Seagoville Medical two months later, on March 25, 2023.  There, BOP medical staff again attempted to test Mr. Fredrickson for tuberculosis through a TST with a PPD injection, but he refused again, telling them that he requested a religious accommodation.

84.     For the first time since his intake, FCI-Seagoville medical staff agreed to accommodate Mr. Fredrickson's religious belief.  They prescribed testing him for tuberculosis through both IRGA and a chest x-ray.  FCI-Seagoville medical staff included the IRGA test as part of the annual routine blood panel screening for HIV.  They also prescribed a chest x-ray, which was performed on May 1, 2023.  Exhibit G (2023 Chest X-ray).  Mr. Fredrickson believes that FCI-Seagoville medical staff permitted these alternative testing methods not as a formal accommodation for his religious belief but because the timing was convenient.  His blood was

already being drawn for other infectious disease testing, and he was recently prescribed a facial x-ray for an unrelated physical injury.

85.    On May 5, 2023, Mr. Fredrickson considered appealing the lack of decision for his accommodation request but was unable to file a BP-9 form because FCI-Seagoville did not have any BP-9 forms available for inmates.  A fellow inmate filed a BP-9 grievance for the lack of available forms.  To Mr. Fredrickson's knowledge, FCI-Seagoville did not restock BP-9 forms in 2023.

**The Second Official Request for Religious Accommodation**

86.    On June 22, 2023, Mr. Fredrickson again attempted to request a religious accommodation through an alternate method in accordance with his religious beliefs.  After Defendant Weaver denied his request in March, Mr. Fredrickson determined to renew his original request through Defendant Schanfish.

87.    Mr. Fredrickson sent Defendant Schanfish a second electronic message request for a religious accommodation to be tested for tuberculosis by a method that did not require a PPD injection.  Exhibit H at 5–6 (2023 Messages to Schanfish).  In the second request, Mr. Fredrickson stated that it is against his Orthodox religious belief to have any kind of injection, including PPD injections, and that the refusal of FCI-Seagoville's correctional and medical staff violated his religious beliefs as a form of punishment.  Mr. Fredrickson also informed Defendant Schanfish that Defendant Weaver had threatened him.

88.    Defendant Schanfish again impermissibly questioned the veracity of Mr. Fredrickson's just belief.  First, Defendant Schanfish contested Mr. Fredrickson's religion, stating that he was not Orthodox, but Protestant.  Exhibit H at 5 (2023 Messages to Schanfish).  Defendant Schanfish continued that as a Protestant chaplain, he can "definitively say that there is

no religious prohibition in any denomination of the Protestant faith community that prohibits TB skin tests." *Id.* Defendant Schanfish also stated as a reason for denial that there was no immediate need for Mr. Fredrickson to receive a tuberculosis skin test because he was recently tested. *Id.* Defendant Schanfish did not affirmatively deny or approve Mr. Fredrickson's religious accommodation request.

89.    On August 2, 2023, Mr. Fredrickson followed-up on the status of his request by replying to Defendant Schanfish's last message. Mr. Fredrickson reiterated his religion as an Orthodox Christian and presented arguments for the veracity of his faith and his choice to honor that faith by refusing injections. He further advised that relying on "no immediate need" for tuberculosis testing was only "kicking the can down the street," as annual tuberculosis testing would continue while he remained in the BOP's custody and care. Exhibit H at 5 (2023 Messages to Schanfish).

90.    Defendant Schanfish then instructed Mr. Fredrickson to complete a second "New and Unfamiliar Religious Questionnaire" form because the "first one [Mr. Fredrickson] filled out was incomplete and [] now out of date." *Id.* This was the first time Mr. Fredrickson was notified that Defendant Schanfish had not processed the first New and Unfamiliar Religious Questionnaire form and religious accommodation request.

91.    After submitting the second New and Unfamiliar Religious Questionnaire form, Mr. Fredrickson again did not receive an approval or denial. He asked Defendant Schanfish about the form when he saw him at regularly held religious services, but Defendant Schanfish did not provide a substantive update. Mr. Fredrickson again believed that because he submitted a form through the Seagoville Chapel and chaplain's office, his request was outside the

traditional BOP Inmate Administrative Remedy program.  Regardless, without a decision on his request, he did not believe his request was ripe for appeal.

**The Third Forced Injection at FCI-Seagoville**

92.     As time progressed towards his annual tuberculosis test, Mr. Fredrickson became increasingly anxious.  In March and May 2024, FCI-Seagoville still did not have available BP-9 forms, which prevented any possible appeal.  Exhibit I (March 2024 BP-8 Grievance for BP-9 forms).

93.     On or about March 18, 2024, Mr. Fredrickson was called to Seagoville Medical, where Defendant Alausa attempted to administer a TST with a PPD injection.  Mr. Fredrickson refused, stating that his religious beliefs prohibited him from receiving injections, and Defendant Alausa allowed him to refuse testing, documented in the FCI-Seagoville medical records. Exhibit J (2024 Refusal of Treatment).

94.     One week later, on March 25, 2024, Mr. Fredrickson was called to Seagoville Medical again.  At that time, he still had not received any communication regarding the status of his previous religious accommodation requests.  At Seagoville Medical, Defendant Alausa again attempted to administer a TST with a PPD injection.  Mr. Fredrickson again stated his request for a religious accommodation and suggested Defendant Alausa prescribe a chest x-ray as an alternative, stating that he received the same allowance in 2023.  Defendant Alausa denied the request for a chest x-ray and continued to insist on administering a TST with a PPD injection, but at Mr. Fredrickson's insistence, she eventually relented and allowed him to leave Seagoville Medical without performing any tuberculosis test.

95.     Shortly after, Mr. Fredrickson was called back to Seagoville Medical where he met Defendant King.   Defendant King impermissibly questioned the veracity of Mr.

Fredrickson's religious belief by asking why he received three PPD injections in the past if he had a religious objection to injections. When Mr. Fredrickson stated that all three injections occurred against his will under threats and coercion, Defendant King acknowledged that medical records reflected his refusal of the PPD injection in 2023. Exhibit E (History of PPD Injections).

96.     Defendant King told Mr. Fredrickson that the BOP did not allow a religious accommodation for tuberculosis testing methods. The only accommodation allowed would permit rescheduling of testing to avoid religious holidays, like Ramadan. Defendant King then denied the request to have another chest x-ray, incorrectly stating that BOP policy required tuberculosis testing by TST. He stated that the BOP policy is enforced by Defendants South Central Regional Psychologist and South Central Regional Medical Director, who denied Mr. Fredrickson's request by relying on their enforcement of BOP policy's for TST.

97.     Defendant King then threatened that if Mr. Fredrickson continued to refuse a PPD injection, he would be placed in the SHU, and if he continued to refuse after 24 hours there, BOP correctional officers would "suit up" in a five-man team to restrain and inject him by force. Defendant King further told Mr. Fredrickson that because no inmate can refuse testing by a PPD injection, every adult in the BOP custody is tested by TST. Although Defendant King confirmed that the BOP Infectious Disease Policies allow a TST exemption for inmates who have records of a positive TST while in BOP custody, those inmates will continue to receive an initial TST test as part of BOP intake procedures.

98.     When Mr. Fredrickson argued that the BOP Infectious Disease Policies listed IRGA and chest x-ray as alternatives testing methods, Defendant King denied those options were available. Defending King reiterated his threat: "I'm telling you, we are going to give you a

tuberculosis test today, and if not today, tomorrow, and you will stay in the SHU for the duration until the test is read."

99.    Defendant King continued to deny Mr. Fredrickson's pleas and stated that the decision for Mr. Fredrickson to receive a TST with a PPD injection was final after "six emails went all the way up on Friday," which included the acting Warden at the time, Defendant South Central Regional Medical Director FNU Russle, Defendant Schanfish, and Defendant South Central Regional Psychologist.  Defendant King denied Mr. Fredrickson a copy of those emails.

100.    In the face of another impossible choice between placement in the SHU, physical assault, and forceful injection in an adherence to his religious beliefs or accepting an injection against his religious belief, Mr. Fredrickson elected to receive the PPD injection.  Exhibit E (History of PPD injections).  He covered his face at the time of injection to avoid seeing his body violated against his religious belief.

**Administration Change at FCI-Seagoville**

101.    Soon after the forced injection on March 25, 2024, Mr. Fredrickson learned FCI-Seagoville had a new warden, Defendant Scarlet Grant, and Defendant Weaver was no longer a member of its medical staff.  With the removal of Defendant Weaver and his previous threats against Mr. Fredrickson, Mr. Fredrickson was free to request a religious accommodation, this time using the BOP Administrative Remedy Program, without fear of retaliation.  A new chaplain, Mr. Brown, began to work in the Seagoville Chapel with Defendant Schanfish.

102.    On April 3, 2024, Mr. Fredrickson sent an electronic message to Defendant Grant as a BP-8 informal resolution leading to what he assumed would become later appeals.  Exhibit K (Letter to Warden).   He stated his intention to file a federal lawsuit and seek monetary

damages for the denial of his religious accommodation requests and the forced injections he suffered. *Id*.

103.    That same day, with Mr. Brown now in the Seagoville Chapel, Mr. Fredrickson again requested a religious accommodation for alternative testing by submitting a third "New and Unrecognized Religion Questionnaire" form.  On the form, Mr. Fredrickson again described his religious beliefs and understanding that his religious tenants prohibited injections.  He provided supporting Bible verses and the two alternative methods to avoid TST testing as a least restrictive means of tuberculosis screening.

104.    The following day, Defendant Grant responded that administrative remedies were unavailable for the requested religious accommodation and instead Mr. Fredrickson would have to file a federal lawsuit to seek monetary remedies.  *Id*.  Defendant Grant did not address the denial of his previous requests for accommodation or PPD injections.  Mr. Fredrickson appealed this denial through a BP-9 form.

105.    Mr. Fredrickson did not receive a denial or approval of his third "New and Unrecognized Religion Questionnaire" form.  When he inquired about his request's status with a Seagoville Chapel staff member, he was told that the process was stalled while they waited for approval from South Central Regional administrators.

106.    After months of waiting, Mr. Fredrickson was called to the Seagoville Chapel on February 4, 2025.  There he met with Defendant Schanfish who informed him that the following day, there would be a meeting between Defendant Schanfish, Defendant King, and South Central Regional administrators to discuss Mr. Fredrickson's pending request for religious accommodation.

107.    The following day, Mr. Fredrickson went to Seagoville Medical and spoke with Defendant Alausa about his request for religious accommodation.  She again denied his request and stated that tuberculosis testing by IRGA was impossible.  He immediately attempted to appeal her denial by going to the Seagoville Chapel to speak with Defendant Schanfish.  At the Seagoville Chapel, Mr. Fredrickson unwittingly interrupted the meeting held to discuss his religious accommodation.  He provided Defendants Schanfish, King, and other unknown persons from South Central Regional administration with a copy of the BOP Infectious Disease Policies.

108.    Mr. Fredrickson was soon called back to the Seagoville Chapel where Defendant Schanfish introduced him to the FCI-Seagoville Captain Carpenter.  During the course of Mr. Fredrickson's conversation with Captain Carpenter, Mr. Fredrickson explained his religious objection again and informed him that he had not received a denial or approval, which Captain Carpenter appeared to not know.  Mr. Fredrickson was then dismissed.

109.    Mr. Fredrickson did not receive an update on the outcome of that meeting or the status of his religious accommodation request, but the next day in the FCI-Seagoville administration offices, he was served with an incident report ("the Incident Report") titled "Prohibited Act Code 307 – Refusing to obey an order, specifically mandatory tuberculin testing (TB skin test)."  The Incident Report alleged the following:

> Inmate FREDRICKSON, TIMOTHY, #22005-026 reported to Health Services and refused his annual mandatory TB screening (aka "PPD skin test [sic]). Medical staff reviewed and referenced policy, then carefully explained to inmate Fredrickson #22005-026 there is NO religious exemption for annual TB screenings. Inmate Fredrickson 22005-026 stated, "I am not refusing the TB test, I am only requesting an alternative test such as the Quantiferon test which is a blood test. I don't want anything injected into me according to my religious rights". Inmate then departed Health Services without medical staff being able to complete this annual mandatory Tuberculin testing ("TB skin test").

Exhibit L (Incident Report) (errors in original).  The Incident Report lists Defendant King as the reporting employee.

110.    The Incident Report, however, contains false information.    Specifically, Defendant King was not present in Seagoville Medical on February 5, 2025 when Mr. Fredrickson spoke to Defendant Alausa.  Further, Mr. Fredrickson was not there to receive tuberculosis testing, but to provide a copy of the BOP Infectious Disease Policies to Defendant Schanfish.  At no time on February 5, 2025 did a member of the FCI medical staff attempt to administer any method of tuberculosis testing to Mr. Fredrickson.  The falsified Incident Report, as a disciplinary report, appeared to be retaliation for Mr. Fredrickson's persistence in requesting a religious accommodation.

111.    When he received the Incident Report, Mr. Fredrickson objected to its errors immediately and in the presence of Captain Carpenter.  Mr. Fredrickson then observed and heard Captain Carpenter make a series of phone calls to unknown persons, asking them to informally resolve the incorrect Incident Report.  Mr. Fredrickson received no discipline for the actions described in the Incident Report.

**Accommodation Granted but Immediately Ignored**

112.    On March 7, 2025, Mr. Fredrickson was called to the Seagoville Chapel to meet Defendant Schanfish.  Defendant Schanfish informed him that his religious accommodation to be tested for tuberculosis by IRGA blood draw was approved, and provided Mr. Fredrickson with a written approval form.  Exhibit M (Accommodation Approval).  The approval form stated:

The Religious Issues Committee (RIC) convened on February 4, 2025.  After research and consultation with the Central Office the warden has approved you to be tested for Tuberculosis with a blood draw.  Please be advised this will be the annual method of testing for you each year moving forward. I trust this addresses your concern.

*Id.* (errors in original).  The form was unsigned.  *See id.*  Defendant Schanfish said that given the approval of Mr. Fredrickson's religious accommodation request, the IRGA was scheduled for the following Monday, March 10, 2025.

113.    Mr. Fredrickson was called to Seagoville Medical the following day, Saturday, March 8, 2025, where Nurse Tews informed him to take a seat for his tuberculosis test.  When she presented a needle prepped with PPD, Mr. Fredrickson objected, stating that his religious accommodation had been approved to receive tuberculosis testing by IRGA, not a TST with a PPD injection.  She refused to acknowledge the accommodation but, after Mr. Fredrickson's continued insistence, permitted him to retrieve the approval form from his cell.  When he returned with the form, she rejected it as inauthentic because it did not contain the warden's signature and was not on BOP letterhead.  When he continued to refuse the PPD injection, Nurse Tews escalated to threats and called over the walkie-talkie for a lieutenant to come to Seagoville Medical to restrain Mr. Fredrickson and place him in the SHU.  When no lieutenants were available, Nurse Tews allowed Mr. Fredrickson to return to his cell.

114.    On Monday March 10, 2025, Mr. Fredrickson was called to Seagoville Medical again to be tested for tuberculosis.  The medical staff allowed his approved accommodation and drew his blood for IRGA testing.

115.    The IRGA test and a subsequent chest x-ray showed Mr. Fredrickson was positive for latent tuberculosis.  After inquiry into the source of medication prescribed to treat his latent tuberculosis, Mr. Fredrickson was assured that the medications would not violate his religious

beliefs and took them as prescribed.   He has completed the prescribed course and is asymptomatic.

116.    Regardless of his documented prior positive TST, Mr. Fredrickson remains at risk of routine tuberculosis screening through a TST with a PPD injection.  Because BOP Infectious Disease Policies requires all inmates to be tested at intake screening, Mr. Fredrickson could be subjected to a TST with a PPD injection testing at a different BOP facility were he to be transferred.   Given his experience with FCI-Seagoville medical staff refusing to honor his accommodation, he is likely to be coerced into another TST with a PPD injection, repeating the circumstances that led him to receive three forced PPD injections at FCI-Seagoville.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### Violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(c)

**(Against Defendants Weaver, Schanfish, Wallace, South Central Regional Director, Russle, South Central Regional Medical Director, South Central Regional Psychologist, Zook, Rivers, Grant, King, and Alausa in their individual and official capacities)**

117.    Plaintiff Timothy Fredrickson incorporates by reference each and every allegation contained in the paragraphs above.

118.    Plaintiff sincerely believes that any injection of an unnatural substance into his body violates his core religious beliefs, including by violating his body as a temple for God.

119.    This is a fundamental and core tenet of Plaintiff's religious beliefs because of the central role that respect for the body as a temple of God play in his Christian faith.  He therefore believes that his religion requires him to organize his life according to this central tenet.

120.    Plaintiff requested a reasonable accommodation to be tested for tuberculosis by one of two alternative and available methods—IRGA or a chest x-ray—that would not violate his

sincerely held religious belief that prohibits PPD injections. There are no other means for Plaintiff to exercise his belief against injections. His belief requires that he not be injected, and any such injections violate his ability to exercise his belief by following one of the tenets of his faith.

121.    Defendants denied Plaintiff's request and threatened Plaintiff to submit to PPD injections or face punishment, including isolation in the SHU for an undetermined length of time. Defendants threatened retaliation and physical punishment, and ultimately injected Plaintiff against his will three times.

122.    Defendants forced Plaintiff into an impossible choice between, on one hand, obeying his sincerely held religious belief and being subjected to the punishment of placement in the SHU and physical restraint until Plaintiff submitted PPD injections, or, on the other hand, violating his sincerely held belief to avoid punishment and physical harm.

123.    By forcing Plaintiff into this impermissible choice between his sincerely held religious beliefs and the threat of retaliation and punishment, Defendants placed a substantial burden on Plaintiff's exercise of his sincerely held religious beliefs in violation of RFRA, 42 U.S.C. § 2000bb-1(a).

124.    Although the BOP has a compelling interest in screening federal inmates for infectious diseases like tuberculosis, requiring Plaintiff to be tested by a TST with a PPD injection is not the least restrictive means of furthering that compelling government interest in the face of two alternate methods of testing, IRGA and a chest x-ray, which are readily available in BOP medical facilities.

125.    By forcing Plaintiff to receive a PPD injection three times by resorting to threats of retaliation and punishment, Defendants substantially burdened Plaintiff's sincerely held beliefs in violation of the RFRA.

126.    Defendants' unlawful actions and failures are imposing an on-going harm on Plaintiff and have caused Plaintiff emotional and spiritual distress and deprivation of his constitutional and statutory rights.

## SECOND CLAIM FOR RELIEF

### Violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(c)

**(Against Defendants Marshall, South Central Regional Director Russle, South Central Regional Medical Director, South Central Regional Psychologist, Zook, Rivers, Grant, and King in their official capacities)**

127.    Plaintiff Timothy Fredrickson incorporates by reference each and every allegation contained in the paragraphs above.

128.    Plaintiff sincerely believes that any injection of an unnatural substance into his body violates his core religious beliefs, including by violating his body as a temple for God.

129.     This is a fundamental and core tenet of Plaintiff's religious beliefs because of the central role that respect for the body as a temple of God play in his Christian faith.  He therefore believes that his religion requires him to organize his life according to this central tenet.

130.    Plaintiff requested a reasonable accommodation to be tested for tuberculosis by one of two alternative and available methods—IRGA or a chest x-ray—that would not violate his sincerely held religious belief that prohibits PPD injections.  There are no other means for Plaintiff to exercise his belief against injections.  His belief requires that he not be injected, and any such injections violate his ability to exercise his belief by following one of the tenets of his faith.

131.    Defendants, acting in their official capacity and under color of authority, were and remain responsible for promulgating, implementing, maintaining, administering, supervising, or evaluating the BOP Infectious Disease Policies.    Specifically, Defendants South Central Regional Director Russle, South Central Regional Medical Director, South Central Regional Psychologist, Zook, Rivers, Grant, and King had knowledge of and reviewed Plaintiff's request for accommodation, and exercised their authority to deny his request.

132.    Defendant Marshall, as the Director of the BOP, acting in his official capacity and under color of authority, was and remains responsible for promulgating, implementing, maintaining, administering, supervising, or evaluating all BOP policies, including the BOP Infectious Disease Policies that prohibit religious accommodation in the method of tuberculosis testing.    By failing to provide a method for religious accommodation, Defendant Marshall deprived Plaintiff of his right to free exercise of his religious beliefs in violation of the First Amendment to the U.S. Constitution.

133.    By prohibiting any form of religious accommodation in the methods of tuberculosis testing, and by failing to articulate and publish clear protocols for inmates to request religious accommodations or for BOP staff to receive and evaluate religious accommodation requests, Defendants facilitated the abuse of the BOP Infectious Disease Policies and substantially burdened Plaintiff's exercise of his sincerely held religious beliefs in violation of the RFRA.

134.    Defendants will continue to promulgate, implement, maintain, administer, supervise, and enforce BOP policies that violate Plaintiff's religious freedom to free exercise if Plaintiff is not afforded the relief demanded below.

135.    Defendants' unlawful actions are imposing an ongoing harm to Plaintiff and have caused Plaintiff emotional and spiritual distress and deprivation of his constitutional and statutory rights.

### THIRD CLAIM FOR RELIEF

### Violation of the First Amendment: Freedom of Religious Exercise

**(Against Defendants Weaver, Schanfish, Wallace, South Central Regional Director Russle, South Central Regional Medical Director, South Central Regional Psychologist, Zook, Rivers, Grant, King, and Alausa in their individual and official capacities, and Defendant Marshall in his official capacity)**

136.    Plaintiff Timothy Fredrickson incorporates by reference each and every allegation contained in the paragraphs above.

137.    Plaintiff sincerely believes that any injection of an unnatural substance into his body violates his core religious beliefs, including by violating his body as a temple for God.

138.    This is a fundamental and core tenet of Plaintiff's religious beliefs because of the central role that respect for the body as a temple of God play in his Christian faith.  He therefore believes that his religion requires him to organize his life according to this central tenet.

139.    The Free Exercise Clause of the First Amendment to the U.S. Constitution protects the rights of individuals to practice their religion freely.

140.    Plaintiff requested a reasonable accommodation to be tested for tuberculosis by one of two alternative and available methods—IRGA or a chest x-ray—that would not violate his sincerely held religious belief that prohibits PPD injections.  There are no other means for Plaintiff to exercise his belief against injections.  His belief requires that he not be injected, and any such injections violate his ability to exercise his belief by following one of the tenets of his faith.

141.    Defendants denied Plaintiff's request and threatened Plaintiff to submit to PPD injections or face punishment, including isolation in the SHU for an undetermined length of time and physical harm.  Defendants threatened retaliation and physical punishment, and ultimately injected Plaintiff with PPD against his will three times at FCI-Seagoville.

142.    Defendants forced Plaintiff into an impossible choice between, on one hand, obeying his sincerely held religious belief and being subjected to the punishment of placement in the SHU and physical restraint until Plaintiff submitted to forced injection of PPD, or, on the other hand, violating his sincerely held belief to avoid punishment and physical harm.

143.    By forcing Plaintiff into this impermissible choice between his sincerely held religious beliefs and the threat of retaliation and punishment, Defendants, acting under color of law and authority, placed a substantial burden on Plaintiff's exercise of his sincerely held religious beliefs in violation of the First Amendment.

144.    Although the BOP has a compelling interest in screening federal inmates for infectious diseases like tuberculosis, requiring Plaintiff to be tested by a TST with a PPD injection is not the least restrictive means of furthering that compelling government interest in the face of two alternate methods of testing, IRGA and a chest x-ray, which are readily available in BOP medical facilities.

145.    By forcing Plaintiff to receive a PPD injection three times by resorting to threats of retaliation and punishment, Defendants substantially burdened Plaintiff's sincerely held beliefs in violation of the First Amendment.

146.    Defendants' unlawful actions and failures are imposing an on-going harm on Plaintiff and have caused Plaintiff emotional and spiritual distress and deprivation of his constitutional rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

1.     Declare that the policies, practices, acts, and omissions of Defendants described here are unlawful and violate Mr. Fredrickson's rights under the U.S. Constitution and the Religious Freedom Restoration Act;

2.     Order Defendants to grant Mr. Fredrickson's request for religious accommodation to be tested for active tuberculosis through a means other than a TST with a PPD injection, and to provide Mr. Fredrickson with written notice that his religious accommodation is effective in all BOP facilities;

3.     Enter an order enjoining Defendants and their agents, employees, successors, and all others acting in concert with them, from subjecting Mr. Fredrickson to the unconstitutional and unlawful practices described in this Amended Complaint;

4.     Enter an order requiring Defendants to revise the BOP infectious disease management guidelines to require BOP officials to evaluate inmate requests for religious accommodations for tuberculosis testing to accomplish the BOP's compelling government interest through a less restrictive means;

5.     Enter an order awarding Mr. Fredrickson compensatory and punitive damages;

6.     Award such other relief as the Court deems appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

Dated:  August 1, 2025                              Respectfully submitted,

                                                    **BAKER BOTTS L.L.P.**


                                                    By:  */s/ Thomas E. O'Brien*
                                                         Thomas E. O'Brien
                                                         Texas Bar No. 24046543
                                                         tom.obrien@bakerbotts.com
                                                         Oliva Justice Countryman
                                                         Texas Bar No. 24126511
                                                         olivia.countryman@bakerbotts.com
                                                         2001 Ross Avenue, Suite 900
                                                         Dallas, TX 75201-2980
                                                         (214) 953-6500
                                                         (214) 953-6503 (Facsimile)


                                                    **ATTORNEYS FOR PLAINTIFF**